[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The marriage of Deborah and Paul Gregory was dissolved on October 2, 1990. During that contested hearing, the primary issues were custody, residence and visitation as to the two children, Justin and Sarah, who are now nine and five years of age, respectively.
Both parents agreed to an award of joint custody and an order was entered accordingly.
Maret DiGangi, in her Family Relations study, recommended that the father be given physical custody. Robert D. Meier, Ph.D., a licensed psychologist who performed an evaluation at the request of the Family Relations Division, recommended that the father was the preferable parent. Counsel for the minor children urged that the father be given physical custody.
At the time, John Godinez played a meaningful, and adverse, role in the family's lives, having established a relationship with Deborah Gregory. His presence was found to be a negative factor in the childrens' lives. His wife, Patricia Godinez, testified on father's behalf, urging that the father be granted custody. CT Page 1253
Physical custody of the children was awarded to the father, citing the need for the children to have stability in their environment. The award noted that there was no evidence that the mother had not been a caring and devoted parent. In the past, it said, she had the primary responsibility for their rearing.
This current three day hearing, involving many of the same witnesses and all of the same custodial issues, arises from a Motion for Modification dated December 18, 1991, based upon father's change of residence from Montville to Southbury. The Motion seeks a change of custody.
FINDINGS: CUSTODY
On or about December 9, 1991, Paul Gregory made sudden and substantial changes in the childrens' lives without notice to the many people providing those divorce conflicted children with support. Neither the children's school, their friends or neighbors, their counselors nor their joint custodial mother were given advance notice of the sudden move to Southbury, two hours from their Montville home.
The impact of those changes was so severe, that there was strong condemnation of both the move and the father. This court was repeatedly urged to modify custody.
A total of twelve witnesses participated in the hearing.
The most credible and the most helpful to the court were Rosemary Niedzwicki, Denise Donajkowski, Maret DiGangi, and Patricia Godinez, all of whom the court found to be independent, impartial and child focused. Counsel for the minor children, Ramona Dittman, was forceful in her role and similarly helpful and child focused.
Rita Gregaczyk, Paul's mother; Lucy Rickmers, Paul's finance and Tammy Stearns, Paul's friend, were all careful to speak well of their sponsor, but offered little enlightenment to the court.
Noreen Edwards and Lynn Poirot, each of whom were teachers, shared their information, but the relevance of their insights was limited.
Rosemary Niedzwicki, supervisor of the Stonington office of the Child Guidance Clinic of South Eastern Connecticut, and Sarah's counselor since September 1990, testified to a noticeable improvement by Sarah after she spent the summer with her mother. She went on to testify that after father's sudden move, Sarah CT Page 1254 regressed, became anxious, and had difficulty dealing with the move. Sarah hadn't been able to say goodbye to her classmates.
Sarah's stress, following the move, was so great, Rosemary Niedzwicki once again began counseling with her weekly. She described Sarah's anguish about not being with her mother and recommended the child should live with her mother primarily. She urged a change of custody.
When Paul Gregory moved the children to Southbury, he sought to replace Rosemary Niedzwicki as Sarah's counselor.
Denise Donajkowski, of the South Eastern Connecticut Child Guidance Clinic, had been counseling Justin since November 1990. She reported Justin was healthier after spending the summer with his mother. She testified the young boy was extremely unhappy, anxious and tearful following the sudden move. Justin advised her he was prohibited from making any phone calls out of the new telephone district, thus eliminating normal telephone contact with her as well as with his mother. Justin advised her he would like to live with his mother.
When Paul Gregory moved the children to Southbury, he sought to terminate Denise Donajkowski as Justin's counselor.
Maret DiGangi, the Family Relations Counselor, testified father had not handled the move in a responsible manner. Father showed either a lack of awareness of the childrens' needs or understood those needs and chose to ignore them, she testified. She suggested that the move showed father was trying to limit the childrens' mother's involvement with the children. She testified that, although she had supported the father as primary custodian in the past, her assessment of him had changed. She noted that since achieving physical custodianship he had not concerned himself with the childrens' needs. She recommended the mother be given primary physical custodianship.
Robert Meier, Ph.D., court appointed evaluator, who recommended that father be primary physical custodian at the previous 1990 hearing, last spoke with the children on October 3, 1990. He was thus unable to offer a recommendation of the present best interests of the children. O'Neill v. O'Neill. 13 Conn. App. 300
(1988). Doctor Meier reviewed the testimony given by him during the 1990 hearing. With regard to father's sudden move to Southbury, Dr. Meier was of the opinion that if the physical custodian father were to change the childrens' homes, schools and counselors, he should advise the mother in advance. If the children were in counseling and were removed from that counseling, he would hope there would be some preparation for that change. Not notifying the school psychologist, who had been CT Page 1255 involved with Justin, of the move was not good prioritizing, he added.
Patricia Godinez testified. She was the former wife of John Godinez, with whom Deborah Gregory had an affair. She strongly supported Paul Gregory's quest for primary physical custody during the earlier contested dissolution hearing.
She changed her opinion based on her observations over the past sixteen months, she testified. She now believes it is in the childrens' best interests to be in the primary physical custody of their mother.
She testified to asking Paul Gregory if the sudden move were true and being told by Paul that he was tired of Deborah's behavior and was moving far enough away that with the bad weather coming it would be difficult for Deborah to see the children, especially during the week. He listed his work as another reason for the move. Patricia Godinez testified to Paul Gregory's father calling Deborah Gregory foul names in the presence of the children.
Finally, counsel for the minor children, Ramona Dittman, who had also supported father's quest for primary physical custody at the contested dissolution hearing, also reversed her position and urged the court to award the mother custody.
Attorney Dittman argued that since achieving primary physical custody, Paul Gregory had behaved unreasonably and inappropriately. She reported that the children want to live with their mother.
She presented a series of reasons in support of the childrens' preference:
 Father no longer puts the interests of the children before his own. Attorney Dittman cited the move to Southbury as evidence of father's concern with his own convenience (close to work) and his focus on his personal grudges (creating visitation inconveniences for mother).
 His refusal to adjust visitation dates when a change was clearly appropriate.
 His refusal to allow all of the childrens' school papers to be seen by mother.
 His narrow interpretation of mother's holiday visitation rights. CT Page 1256
His embarrassment of Sarah about her haircut.
 His termination of the childrens' relationship with their counselors.
The court did not find either of the principles, Deborah or Paul Gregory, to be credible. Each is so adversarial it has become difficult for them to respond to questions without first focusing on their personal goals and determining which response will best help them achieve that adversarial goal.
Although all three of the parties requested joint custody during the dissolution hearing, only plaintiff mother's Proposed Orders continued to seek that custodial form at the conclusion of this hearing.
The animosity exhibited by the parties and their historical inability to cooperate for the benefit of their children leads the court to conclude that joint custody is inappropriate in this fact situation at this time. Joint custodianship merely becomes a platform from which these parents mount attacks on each other. The court file is replete with motions and counter motions.
Paul Gregory was offered a grand opportunity when the most meaningful witnesses during the 1990 dissolution hearing were all of the belief that he represented the best parenting potential at that time. This despite no evidence that the childrens' mother had not been a caring and devoted parent. This despite their mother having had primary responsibility for the childrens' rearing.
Given the opportunity, the father clearly overreached. He exercised the power of his new physical custodian role in ways that damaged the children. He showed no understanding of either the spirit or the letter of joint custody.
Section 46b-56a (a) of the Connecticut General Statutes specifically provides for "joint decision-making" by the joint custodial parents. Here, unlike the ruling in Tabackman v. Tabackman, 25 Conn. App. 366 (1991), no modifying definition of joint custody had been entered by the trial court. Thus, the statutory definition, requiring joint decision-making, remained.
Defendant father not only acted unilaterally but he did so surreptitiously. He focused on his powers as primary physical custodian rather than on his responsibilities as joint custodial parent. His demeanor was aggressive, self serving and damaging to the children.
Defendant father demonstrated that it is not in the best CT Page 1257 interests of the minor children to have him exercise authority over their lives.
John Godinez no longer plays a meaningful or negative role in the childrens' lives.
The issue of sexual abuse of Sarah was withdrawn. There is no indication that Deborah Gregory is pursuing Paul Gregory as the culprit. But the emergence of a series of sexual abuse charges at Sarah's day care, in which at least one victimized child includes Sarah as an additional victim, was never clarified. Her counselor, Rosemary Niedzwicki, testified to Sarah's graphic sexualized play, her masturbation and her insertion of anatomically correct dolls. She testified to Sarah's taking medicine during such sexualized play, mirroring the allegations that the day care janitor drugged the children he abused. Father continues to refer to sexual abuse of Sarah as if it were a spurious claim concocted by his vengeful former wife.
All of these factors combine to create a material change of circumstances which alters the court's earlier finding of the best interests of the children. Pascal v. Pascal 2 Conn. App. 472
(1984).
FINANCES
Father's net weekly income is $683, mother's is $297.
At the time of dissolution, the trial court ordered that upon father vacating the premises at 48 Birch Terrace, Oakdale, Connecticut, he was to execute and deliver to the plaintiff a promissory note in the amount of $42,500 payable to her order, without interest, to become payable on December 31, 1997, or sooner, upon the occurrence of one of the following events: (2) cohabitation by the defendant with an unrelated female. Father agrees he has vacated the premises and admits to cohabiting with an unrelated female.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815, of the Connecticut General Statutes, a finding shall enter that the custody orders currently in force shall be modified as follows, and the related financial orders shall henceforth be as follows:
1. CUSTODY
Plaintiff mother shall have custody of Sarah and Justin. CT Page 1258
2. ACCESS
Defendant father shall have reasonable rights of access to the minor children, which shall include the following:
a. During the school year, alternate weekends from Friday at 5pm to Sunday at 6 p.m. If a school holiday falls on a Monday, father's access shall be extended until Monday at 6 p.m.
b. During the school summer vacation period, alternate weekends from Friday at 5pm to Monday at 5pm.
c. Throughout the year, alternate Fridays (or other day of mother's choice) from 5pm to 7pm.
d. During the school summer vacation period, four weeks, two of which may be consecutive and uninterrupted. Mother shall also be entitled to two consecutive and uninterrupted weeks during the summer period. Both parents shall be entitled to c, above, when the children are in the other parent's care during the non-consecutive weeks.
e. Mother shall be entitled to the February school vacation.
f. Father shall be entitled to the April school vacation.
g. Father shall have Father's Day, Good Friday and Easter.
h. Mother shall have Mother's Day and the first days of Chanukah and Passover.
i. Parents shall alternate Thanksgiving and Christmas as follows: Thanksgiving shall be from Wednesday at 5pm to Friday at 7pm and Christmas shall be from Christmas Eve at 4pm to Christmas Day at 4pm. Mother shall chose the alternating schedule. When mother has Christmas, father shall have an equal period of time immediately following mother's Christmas access.
j. Father shall have primary responsibility for transportation. The four hour round trip to or from the new Southbury home should not be imposed upon the children for brief access, but is more appropriately an adult burden except when the visitation is a substantial one or, as with Christmas or Thanksgiving, is hearth focused.
k. This court specifically empowers, and encourages, the parties to vary any portion of the access schedules in any mutually agreeable manner. CT Page 1259
3. CHILD SUPPORT
a. Father's net weekly income would normally require him to pay child support of $265 a week, based upon the child support guidelines.
b. Because transportation costs during father's visits with the children as set forth herein will be significant, given the substantial distance between father's new home and the childrens' home, the court finds a deviation criterion to exist and holds that application of the Guidelines would be inequitable and inappropriate.
c. Defendant father shall pay plaintiff mother $250 a week as child support beginning forthwith,
4. $42,500
a. The parties have agreed that this court shall address the issue of the $42,500 payment ordered in the Judgment dated October 3, 1990, at page three thereof.
b. The parties have agreed that the conditions have all been met and that defendant father is now responsible for the payment of the $42,500 to plaintiff mother.
c. Plaintiff father shall pay $10,000 to defendant mother thirty days from this date, $10,000 sixty days from this date, $10,000 ninety days from this date and the balance one hundred and twenty days from this date.
d. The judgment decrees that the $42,500 due is to be paid in a lump sum, without interest. No interest is due if those terms are met, that is, if defendant pays plaintiff the full sum due forthwith.
e. If defendant father wishes to avail himself of the opportunity to make the payment in smaller payments and over a period of time, it is equitable and appropriate that defendant reimburse plaintiff for his use of the money awarded to her by paying interest at the rate of eight percent per annum on the unpaid balance beginning this date.
5. NEGOTIATIONS
a. The court recognizes that the parties may have mutual preferences that have not been revealed to the court during the trial or which the court may have otherwise inadvertently thwarted. CT Page 1260
b. Final divorce terms established by the parties themselves are historically more comfortable for the parties to live with and abide by. Therefore the court empowers the parties to confer and to seek mutually agreeable variations of the court's orders.
c. Any such mutually negotiated modifications are to be submitted directly to the undersigned in written form, signed by all three counsel as well as the plaintiff and the defendant not later than thirty days after this judgment, without costs and without the need to establish a substantial change of circumstances.
d. Beyond that date, or before any other court, modification shall be by the traditional route and must meet all the more formal requirements.
5. APPEAL
All the foregoing orders with respect to custody and access shall stand and operate as interim orders of this court during the pendency of any appeal.
Joseph L. Steinberg